### Joseph Clark v. The State.

#### No. 2772.   Decided October 28, 1903.

**1.—Indictment—Name of Defendant.**

The indictment charged J. C. Clark with the commission of the offense and the jury were sworn to try J. C. Clark; after defendant was arraigned, his name upon suggestion of defendant was corrected to that of Joseph Clark, but the jury were not resworn to try him by that name. Held proper practice under article 549,. Code Crim. Proc.

**2.—Charge of Court—Implied Malice.**

A definition of implied malice in accordance with the approved forms is not subject to criticism.

**3.—Same—Manslaughter.**

A charge upon manslaughter which singles out certain things indicating appellant's state of mind, including such matters as were in evidence as indicating appellant's state of mind to be considered by the jury in connection with such other facts in evidence which might shed light upon such state of mind and which leaves the jury to determine the facts without assuming such condition is not on the weight of the evidence.

**4.—Same—Mutual Combat.**

Although the court might have submitted to the jury the question of mutual combat, where the testimony raises this phase of the case, but such charge would have been against appellant, he can not complain of the court's failure to so charge.

**5.—Evidence—Conflict.**

Where the theory of the State conflicts with that of the defendant and the testimony supports either, a conviction will not be disturbed.

Appeal from the District Court of Wilson.   Tried below before Hon. M. Kennon.

Appeal from a conviction of murder in the second degree; penalty, fifteen years imprisonment in the penitentiary.

Domingo Perez, one of the principal witnesses for the State, testified that he was an eye witness to the homicide; that it occurred at or near a little wire gap, which gap was in the field fence of the deceased where it corners with the Sellers place. The deceased came from his house and was about fifty yards from the fence on the big road. Witness saw the son of the deceased down in the field and saw the defendant's horse tied to Joe Watson's fence, which is opposite and on the other side of the

road from the Sellers and Hollingsworth fence. Deceased came up and tied his mule to his fence near the gap. Defendant and deceased were three or four steps apart; did not hear anything said by either of them; could have heard had anything been said. Deceased then went to the gap, opened and closed it, and as he was turning defendant shot him. Defendant was about six steps from him when he fired the first shot; deceased then turned from defendant and the latter continued to shoot until deceased fell. Deceased did not turn back, after turning from defendant, but fell eight or ten steps from the gap. Witness did not see any kind of weapon in the hands of deceased, before or during the shooting.

The son of the deceased testified substantially that he was about 160 steps from the place where his father was shot, at the time of the homicide. His father was on his mule, which he had geared at the lot and had started to the field to plow corn; his father had to go by the gap to get to the plow and stopped at the gap.; he went through the gap and shut it and started to turn around when defendant shot him. Deceased had his right side to defendant when the latter fired the first shot, and as deceased turned the second shot was fired; at the third shot deceased was running, and fell at the fourth shot. That defendant came to the lot of deceased on the morning of the shooting; that deceased was then gearing his mule to go to plow and had on a pair of overalls. Defendant said that he had come over to see about the money for the colts; deceased asked defendant how much it was and the latter replied $20; deceased said he would only pay $12; defendant insisted on $20, and deceased replied he would not, and after a few more words about the colts, defendant said, "meet me over on the road and we will settle it." Deceased replied, "All right." Defendant rode off on the right side of the lot and went through the east gate and deceased went through the west gate around by the tank to water his mule. Witness went on the way defendant had gone and stopped at the cultivator to take off some plows. Defendant stopped at the gap on the road and tied his horse to Watson's fence across the road and opposite the gap, and then came back to deceased's fence. Deceased came up to the gap, got down, tied his mule and stood at the fence with defendant a few moments. Deceased then went to the gap, opened and closed it, and as he was turning defendant fired. Deceased had no weapon.

Other witnesses corroborated the above testimony. The homicide occurred within a half hour after the meeting of the parties at the lot of the deceased. The wife of deceased testified that his knife was closed and in his overalls, and that he was not armed when he left the house on the morning of the day of the homicide.

Defendant testified substantially that on the morning of the day of the shooting he went to the house of deceased to see him about the money due defendant by deceased for mares served by defendant's horse. Two weeks before he had sent his son to deceased about this matter, who

reported that deceased refused to pay, but would give defendant one of the colts and to come over and see him, and that he (defendant) was willing to take one of the colts. That he and deceased had always been friendly and visiting each other and never had a previous difficulty. Defendant met deceased that morning at the lot; the latter's son was present; passed some pleasant remarks. "I then told him I had come for my money which deceased had agreed to pay when contract was made but now refused, and after some harsh words by deceased, I rode off and told him I would meet him some other time. Deceased said, 'You wait over there at the big road.' I did not intend to wait at the time, but intended to go home. I went through the field, not through the same gate deceased did, and did not see him coming until I got to the big road. I thought over the matter and concluded to compromise the matter with him, and waited for him in the big road. I saw him coming along the field road; his little son was with him, who stopped at a cultivator in the field about 170 yards from where I was. Deceased came up and tied his horse to Sellers' fence. I put my hands on the top wire of the fence and waited for him to speak. Deceased came up from the opposite side of the fence in the field and said, 'God damn you, what do you want?' And I replied, 'Nothing but my money, Jim,' and he replied, 'God damn you, you can't get it. Now what do you want?' I said, 'Nothing but my money.' Deceased then said, 'God damn you, I will give you what you wanted,' and put his hands under the apron of his overalls and started towards me. I turned the wire loose and stepped back and said, 'Now, Jim, if you came down here to bulldoze me you can't do it.' Deceased turned without saying another word and walked down to the gap and opened it. When he turned towards the gap, I knew he was coming out to jump on me and I thought he had a knife. He was a large, powerful man and I very weak. I was terrorized and afraid and knew I was no match for him. When he came out of the gate he shut it, put his hand under the apron of his pants and started toward me. When he got pretty close he said, 'Now, God damn you, I will show you that I am not afraid of you.' I said, 'I don't want any trouble.' He said, 'No, you are a damn coward.' I said, 'God damn you, you had better not run into me if I am.' He said, 'I will cut your damn throat,' pulled his hand out, and I pulled my pistol and fired just as he got his hand out of his apron. I was excited and kept shooting, until I realized that his back was towards me and that I was out of danger. I believed my life was in danger when I fired."

There was some testimony pro and con that deceased was a violent and dangerous man. The above excerpts from testimony of the principal witnesses comprise the essential facts in the case.

The court's charge on implied malice was as follows: "As express malice is an essential element of murder in the first degree, so is implied malice an essential element of murder in the second degree. Implied is constructive malice, and a fact to be specially proven; it is an inference

or conclusion founded upon the particular facts and circumstances of the case as they are ascertained from the evidence to exist. Thus when the fact of an unlawful killing is established and express malice is not proven beyond a reasonable doubt, and there are no circumstances in evidence which tend to mitigate, excuse, or justify the act, then the law implies malice and the murder is of the second degree."

*Morris & Clifton, B. F. Ballard, Ike D. White,* and *W. C. Linden,* for appellant.

*Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of fifteen years; hence this appeal.

Appellant assigns as error the action of the court in swearing the jury, his contention being that the indictment charged J. C. Clark with the commission of the offense and the jury were sworn to try J. C. Clark; that afterwards when defendant was arraigned he corrected his name, stating that he had no middle initial; that his name was Joseph Clark; and the indictment, under the direction of the court, was accordingly amended; that thereafter the jury were not resworn to try Joseph Clark, but tried him under the oath already taken to try said J. C. Clark. There is nothing in this contention. The identity of appellant was the same. The middle initial was an immaterial matter and subject to amendment. Art. 549, Code Com. Proc., provides that when arraigned a defendant may suggest his true name, if it is not given in the indictment, and the cause then proceeds as if the true name had been first recited in the indictment.

Appellant also complains of the charge of the court in defining implied malice. The definition here given is in accordance with the approved forms, and is not subject to the criticism of appellant.

Appellant also contends that the court's charge on manslaughter is on the weight of the evidence, in that it singles out certain portions of the evidence as bearing on appellant's mind at the time of the homicide; and in that it left these matters to be determined by the jury, when it was the duty of the court to have directly told the jury that the evidence showed the existence of such conditions. After the court had defined manslaughter, and had given the jury the law of manslaughter as applicable to the facts, he then charged the jury as follows: "You are to determine from the evidence the state of mind of the defendant when he shot and killed the deceased (if he did so), and in that connection you may consider threats (if any) made by the deceased regarding the defendant, the reputation of the deceased (if such it was) as. a violent and dangerous man, the defendant's personal knowledge (if such he had) that the deceased was a violent and dangerous man, the relative strength

of deceased and the defendant, and all other facts in the case that may shed any light upon such state of mind." With reference to the first objection urged, that the court singled out certain things indicating appellant's state of mind, we would observe that the charge appears to include such matters as were in evidence as indicating appellant's state of mind, and then told the jury to consider in connection with such facts all other facts in evidence that might shed light upon such state of mind. It does not occur to us that appellant can complain of this charge. The contention that the court in said charge left the jury to determine the facts, is equally without support. We understand that it is the duty of the court to leave the facts to be found by the jury, and this is exactly what this charge does. Besides, this is a charge on manslaughter, and if the court had assumed the existence of certain facts that were in issue, and so instructed the jury, such a charge might have trenched on appellant's right of self defense. We see no error in this charge.

As we understand appellant's motion for new trial, no other exceptions were taken to the court's charge on manslaughter, or the failure of the court to charge some other phase of manslaughter, than was submitted to the jury in this case.

Appellant assigns as error the action of the court failing to charge on mutual combat. There is testimony in the record tending to show mutual combat, and the court might well have submitted a charge on this phase of the case to the jury; but it would have been a charge against appellant, and of this he can not complain.

Appellant further contends that the verdict of the jury is contrary to the law and the evidence. We do not agree to this contention. If the jury agreed with the State's theory of the case, they could find defendant guilty of no less offense than murder in the second degree. If, on the other hand, the jury believed appellant's version they should have found him not guilty, as his testimony made a case of self-defense. However, they saw fit to believe the witnesses for the State, and we see no reason to disturb their verdict. The judgment is affirmed.

*Affirmed.*