STATE OF IOWA, Appellee, v. C. L. NICOLA, Appellant.

HOMICIDE: Self-Defense—Threats—Bearing on Defendant's Reasonable Belief. Threats of deceased to kill defendant's mother may be considered by the jury in determining the question whether defendant had reasonable grounds to believe that his mother was in imminent danger of death or great bodily injury from the deceased. Defendant is entitled to a specific instruction to this effect if requested.

PRINCIPLE APPLIED: There was evidence that the deceased at the time of the fatal encounter repeatedly threatened to kill the mother; stated he would do it now, reached into his pocket and started towards her; that the mother called to the son that the deceased was going to kill her. Defendant immediately thereafter shot deceased. The court instructed that if the jury found such threats were made and that the defendant as a reasonably careful and prudent man believed in good faith that the deceased was going to carry out said threats, then the defendant was justified in arming himself for the purpose of protecting his mother. *Held*, not to sufficiently protect the defendant on the effect of threats.

**HOMICIDE:     Self-Defense — Reputation   of   Deceased — Relative**
2   **Strength—Right to Instruction.** Defendant is entitled to a specific instruction if requested that (a) threats made by the deceased against the one assaulted, (b) reputation of the deceased as a violent and dangerous man, (c) defendant's knowledge of such reputation, and (d) the relative strength of deceased and the one assaulted, are all relevant matters to be considered by the jury on the question of defendant's state of mind when he killed deceased.

**HOMICIDE:   Self-Defense—Right to Continue.** If the facts and cir-
3   cumstances are such as to justify in law the employment of self-defense, then such self-defense may be continued until it reasonably appears to defendant that the defendant or the one assaulted is out of danger.

PRINCIPLE APPLIED: In instant case defendant fired two shots. The State claimed the last shot was unnecessary. There was evidence that the first shot might not of itself have caused immediate death, and that deceased did not cease his assault until after the two shots were fired. *Held,* under the above limitation, defendant was entitled to an instruction that he had a right to continue to shoot until it reasonably appeared to him that his mother was out of danger from deceased.

**HOMICIDE:     Self-Defense—Warning  to  Deceased—Necessity  for.**
4   A "warning" to deceased to desist from his assault is not, as a matter of law, a condition precedent to the right to employ self-defense. If a warning might be necessary, it is only in event that it appears to the defendant, as a reasonably prudent and cautious person, that such warning would have been all that was necessary to avoid death or great bodily harm to defendant or to the one defended.

**CRIMINAL LAW:   Defendant's Failure to Testify—Reference to.** A
5   direct reference in the course of a trial to defendant's failure to testify is fatal, under Sec. 5484, Code, to the validity of the trial.

PRINCIPLE APPLIED: Counsel for State during the argument said: "There is another thing in this case that the defendant has not denied and that is the writing of the letter to his brother on the day on which he killed his father." The record made by the court in the presence of the jury showed that the court understood that counsel was referring to the fact that the defendant had not testified. The court directed counsel not to make such reference and the jury not to consider any such reference. *Held,* new trial must be granted.

*Appeal from Mahaska District Court.*—HON. JOHN F.
TALBOTT, Judge.

WEDNESDAY, FEBRUARY 17, 1915.

DEFENDANT was indicted for the crime of murder in the
first degree, and upon trial to a jury was convicted of man-
slaughter; and appeals.—*Reversed* and *Remanded.*

*Frank T. Nash* and *McCoy & McCoy,* for appellant.

*George W. Cosson,* Attorney General, *Wiley S. Rankin,*
Special Counsel, and *James A. Devitt,* for appellee.

DEEMER, C. J.—It is practically conceded that the ver-
dict has support in the testimony, and the errors relied upon
for a reversal relate to the instructions given and refused,
and to alleged misconduct of counsel for the State.

Deceased was defendant's father, and the homicide grew
out of an altercation at the father's home, and defendant con-
tends that the shooting was due to an assault made by de-
ceased upon his mother and was in defense of her person.
Deceased was a conductor in the employ of the Minneapolis
& St. Louis Railway Co., and was at home on the day of the
affray resting up and getting ready for his next run, the
train he was to take leaving Oskaloosa about six o'clock in
the evening of the day he was killed. He did not get along
well with his wife, and they often quarreled with each other.
Just prior to the homicide, which occurred some time during
the middle of the afternoon, deceased had been resting in his
bedroom on the second floor of the house, and he came down-
stairs with his wife. He was angry when he came down, and
shortly after getting to the lower story he threatened to kill
his wife, and declared he would shoot her "right away."
Deceased then took a chair and attempted to lace his shoes.

In the meantime defendant, without the knowledge of
either parent, came down from the upper story of the house.

He had in his possession a loaded revolver, which he had purchased in Oskaloosa two or three days before the shooting. He (defendant) went to the bathroom, which was to the rear of the chair in which deceased was sitting, and while deceased was, as the State claims, still in the act of lacing his shoes, defendant, who was standing in the bathroom door, without speaking a word, fired the revolver at his father, the ball striking him in the head at the base of the brain. Again, without saying anything, he fired another shot, the ball striking the father in the front of the head, a little to the side of the middle of the forehead. Both shots were fatal in character and deceased was almost instantly killed.

Defendant claims, and his mother gave testimony tending to show, that at the time of the shooting deceased was chasing his wife around the room; that he was armed with an old razor which he was threatening to use; and that to protect the mother, defendant shot him, and as a result he (deceased) backed up and sat down in the chair near which he was found; that before the second shot was fired he raised up and turned toward the bathroom door where defendant was standing, and was in the act of attacking defendant with his razor.

The only eyewitness, aside from the defendant, who was not on the witness stand, was the mother, who thus explained the transaction:

"My husband returned home about 3 o'clock that afternoon. I was in the sewing-room when he came home and Chattie was in there also, with my baby. My husband came upstairs and stopped at the sewing-room door and looked at me and then went in the southeast room. After he went in there he lay on the bed I guess; anyway my son and he were talking together there for about twenty minutes. I was not in the room at that time and do not know what they were talking about. My husband called Bertha, and I got up and went right to the door, just to the door. He raised up out of the bed, pointed his finger at me and said, 'God damn you, who are your lawyers?' I said, 'Why, Will; what do you

mean, I have no lawyers.' He said, 'God damn your soul, you have, and you have got to tell me, and tell me who they are mighty quick.' I tried to reason with him that I had no lawyers; that I was not to see a lawyer at any time. He would not reason or listen; he threatened to kill me, and started to get up out of bed. He started towards me and turned and started towards the stairway to go downstairs. My son Chattie did not say anything to my husband at all. I started downstairs and Mr. Nicola followed me within six or eight feet. I went downstairs into the reception room, and he followed me there. I went into the kitchen—just went inside the kitchen door and he stood there and threatened me. I still kept trying to reason with him to make him understand that I hadn't seen any lawyers; he wouldn't reason, he wouldn't listen; he kept threatening me there at the kitchen door. I came back into the dining-room and he said, 'There, I have a gun loaded ready for you, and God damn your soul, I want you to tell me and tell me quick who your lawyers are.' I came back out of the kitchen into the dining-room and he closed the kitchen door and crossed over and sat down in a chair, still making threats as he went. He sat down in a chair, and dropped his head for a second, and then stooped over and started to lace his shoes, but he did not finish; he raised up and said: 'God damn your soul,' he said, 'I will kill you.' He said, 'I have got to do it, and damn your soul I will do it now.' After he raised from the chair he put his hand into his pocket and it looked like he had hold of a revolver. He raised up and came two or three steps toward me. I screamed to Chattie for help, that father was going to kill me. Just then I heard a report. He turned just so and fell back into the chair. He raised again with the same vicious look, jammed one hand in his pocket, and the other hand clinched and his teeth clinched. He turned on Chattie and then a second report. Chatty came around in front of his father and burst out crying and said to his father, 'See what you have compelled me to do.' He says, 'I did it to save mother; are you sorry?' And his father nodded his head twice.''

When deceased was found by the coroner his body was lying to the south of the bathroom door, in an angling position, with his head toward the door. His right hand or thumb was tucked into his pocket, and a closed razor was about half way out of the pocket. There was fresh blood on the wall of the room near the bathroom door, and about thirty inches above the floor. Defendant immediately surrendered himself to the police, saying that he had shot his father, guessed he had killed him, and that he did so "to protect his mother."

Enough has now been stated for an understanding of the points relied upon for a reversal of the judgment.

I. Defendant asked the following instructions:

1. HOMICIDE: self-defense: threats: bearing on defendant's reasonable belief.

"42. If you believed from the evidence that deceased, William Nicola, made any threats against the life of Bertha Nicola, you may take into consideration such threats in determining whether defendant was justified in acting upon appearances when he killed the deceased.

"43. If you find from the evidence that William Nicola, the deceased, prior to the tragedy made any threats against his wife, Bertha Nicola, then such threat or threats, if any, should be considered by you as explaining the conduct or apprehension of said defendant, if any, at the time of such killing.

"45. You are instructed that you may consider, in determining as to whether the defendant had reasonable grounds for believing that his mother, Bertha Nicola, was in an imminent danger of death or great personal injury from the deceased, prior to the shooting had made threats to the said Bertha Nicola that he would kill or injure her."

The only instruction given by the trial court referring to these threats, was as follows:

"28. You are instructed that if you find from the evidence that the deceased, William Nicola, had threatened to

take the life of Bertha Nicola, and if he had made said threats, if any, in the presence of the defendant, or if you find that said threats had been reported to the defendant, and that the said defendant, as a reasonably careful and prudent man, believed in good faith that the deceased was going to carry out said threats, then the defendant was justified in arming himself for the purpose of defending and protecting said Bertha Nicola in the event the said William Nicola should endeavor to carry out said threats. But in considering this matter you should take into consideration the apparent necessity for such action on the part of the defendant and if you find from the evidence beyond a reasonable doubt that he armed himself for the purpose of engaging in a conflict with William Nicola, and for the purpose of killing him, and not for the honest purpose of self-defense, or the defense of Bertha Nicola, then he was not justified in so arming himself, and such act will under such circumstances be competent evidence of malice and intent.''

We do not think the instruction given met the propositions involved in the requests; and it is practically conceded that the latter announced correct propositions of law. If not conceded, it is well settled that they are correct expositions of the law of self-defense. *State v. Beird,* 118 Iowa 474, 478; *People v. Zigouras,* 57 N. E. (N. Y.) 465; *State v. Petsch,* 20 S. E. (S. Car.) 993.

II. Defendant also asked the court to instruct as follows:

''27. You are to determine from the evidence the state of mind of the defendant when he shot and killed the deceased, if he did so, and in that connection you may consider threats, if any, made by the deceased against

**2. HOMICIDE:**
**self-defense:**
**reputation of**
**deceased, rela-**
**tive strength:**
**right to in-**
**struction.**

his wife, the reputation of the deceased, if such it is, was as a violent and dangerous man, the defendant's personal knowledge if such he had that the deceased was a violent and dangerous man, the relative strength of deceased and defend-

ant, and all other facts in the case that may shed any light upon such state of mind."

Nothing of like import was given, and the refusal to give the instruction was error. *Clark v. State,* 76 S. W. 573, 574.

3. HOMICIDE: self-defense: right to continue.      III. The firing of the two shots was one of the essential features of the case, and as bearing thereon the defendant asked the following instruction:

"44. If you believe that at the time of the attack, if any, of the deceased upon his wife, which reasonably appeared to the defendant, that the purpose was either to kill or do her serious bodily injury then, if you so believe, defendant would have the lawful right to defend her from such attack; and, if defendant commenced to shoot under such circumstances, you are instructed that he would have the right to continue shooting at deceased, until it reasonably appeared to him, from his standpoint, that she was out of danger from such unlawful attack."

Nothing of this character was given. The instruction was correct and should have been given as requested. *Kelly v. State,* 62 S. W. (Tex.) 915.

Much was made by the State, of course, of the firing of the second shot, and an instruction upon the subject was quite essential in order that the jury might be advised as to the bearing of this evidence upon defendant's right of self-defense. Defendant contended and introduced evidence to show that the first shot was not likely to result in immediate death, and testimony was offered tending to show that deceased did not cease his assault until after the second shot was fired. It was for the jury to settle any dispute in the testimony with respect to this and to apply the law to the facts as found.

IV. Instruction No. 30, given by the trial court, reads as follows:

"'You are instructed that Bertha Nicola, being in her own home, where she had a right to be, need not retreat, and the defendant would have the same right to defend her that she would have to defend herself. And if William Nicola so acted, under such circumstances as to induce in the defendant a reasonable and honest belief that his mother was in danger of losing her life or receiving a great bodily harm from the immediate acts of the father, he would have a right, under the law, to prevent the threatened injury even to the taking of the life of said William Nicola, but you are instructed that he would have no right to take the life of said William Nicola, without first warning him to desist from his attack unless you find from the evidence that defendant was justified in believing that he had not time to give such warning."

4. HOMICIDE:
   self-defense:
   warning to
   deceased:
   necessity for.

The qualification of this instruction regarding warning to the deceased is complained of, and we think the complaint is well founded. It was not necessary as a matter of law for defendant to have warned the deceased before firing the fatal shot; and if a warning might be necessary, it was only, in the event that it appeared to the defendant, as a reasonably prudent and cautious person, that such warning would have been all that was necessary to save the mother from harm. Such a warning as is referred to in the instruction necessarily had reference to whether or not defendant might have saved his mother by some other means than taking the life of her assailant.

A warning before shooting was not required, as a matter of law; and under no circumstances, save as it reasonably appeared to defendant that by so doing he might have avoided the necessity of taking life. The qualification was likely to confuse the jury, and it was really inconsistent with what preceded. From any standpoint it was, as we think,

erroneous.   See, as supporting this view, *People v. McCard,* 40 N. W. (Mich.) 784.

5. CRIMINAL          V. During the argument of the case, one
LAW: defend-
ant's failure     of counsel for the State used the following
to testify:
reference to.     language:

"There is another thing in this case that the defendant has not denied and that is the writing of the letter to his brother on the day on which he killed his father."

The defendant's counsel objected, as shown, and the court made the following record thereon:

"Counsel for the defendant except to the statement just made by counsel for the State in regard to the defendant not denying as prejudicial.

Court: "The county attorney is advised not to make any reference to the failure to testify on the part of the defendant and any remark of counsel in regard to that should not be considered by the jury; and you, gentlemen, are advised not to consider anything said in respect to the failure of the defendant to testify.

Mr. McCutcheon: "What I meant, gentlemen, is that the attorneys for the defendant have not denied the writing of this letter to Des Moines.   Objections and exceptions to court's instructions."

Code Sec. 5484 reads as follows: "Defendants in all criminal proceedings shall be competent witnesses in their own behalf, but cannot be called as witnesses by the state; and should a defendant not elect to become a witness, that fact shall not have any weight against him on the trial, nor shall the attorney or attorneys for the state during the trial refer to the fact that the defendant did not testify in his own behalf; and should they do so, such attorney or attorneys will be guilty of a misdemeanor, and defendant shall, for that cause alone be entitled to a new trial."

The reference made by counsel in argument was specifically to the defendant as not having denied a matter of testimony; and the trial court was of opinion that counsel was referring to defendant's failure to take the witness stand on his own behalf. If the court so understood it, certainly the jury must have had the same impression. Surely after hearing the remarks of the court no doubt remained in its mind. So long as the statute remains in force it must be respected by the courts, even though they regard it as of doubtful propriety. *State v. Baldoser,* 88 Iowa 55; *State v. Hector,* 158 Iowa 664, and cases cited.

In the cases relied upon by the State, there was no direct reference, as here, to defendant's failure to deny. *Vide. State v. Seely,* 92 Iowa 488, 490; *State v. Snider,* 119 Iowa 15; *State v. Hasty,* 121 Iowa 507; *State v. Baker,* 143 Iowa 224; *State v. Krampe,* 161 Iowa 48; *State v. Davis,* 110 Iowa 746.

In addition to the two cases already cited in support of this opinion, the following sustain the holding that the remarks in the instant case were within the inhibition of the statute. *State v. Graham,* 62 Iowa 108; *State v. Ryan,* 70 Iowa 154.

In no case have we held that a direct reference to defendant's failure to testify upon the witness stand is not within the prohibition of the statute. A new trial should have been granted on this ground alone.

VI. Other matters are argued, but they are either without merit or will not arise upon a retrial. But for the errors pointed out, the judgment must be reversed and the cause remanded for another trial.—*Reversed* and *Remanded.*

LADD, GAYNOR and SALINGER, JJ., concur.